**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARY TOROK,

        Plaintiff,

                                  Case No. 04-74699

v.                                  Hon. Gerald E. Rosen

GIBRALTER VETERINARY HOSPITAL, INC.,

        Defendant.

_____/

**OPINION AND ORDER REGARDING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on___August 10, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I.  INTRODUCTION

Plaintiff Mary Torok commenced this action in this Court on December 1, 2004,

alleging that her former employer, Defendant Gibralter Veterinary Hospital, Inc., violated

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* and the Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.,* and also breached an

employment contract between the parties.  As the principal ground for all of these claims,

Plaintiff alleges that Defendant constructively discharged her just a few weeks after she

returned from a disability leave.  This Court's subject matter jurisdiction rests upon

Plaintiff's assertion of claims arising under two federal statutes, the ADA and the FMLA.

See 28 U.S.C. §§ 1331, 1367(a).

By motion filed on November 22, 2005, Defendant now seeks summary judgment in its favor on Plaintiff's federal and state-law claims.  In support of this motion, Defendant primarily argues:  (i) that Plaintiff has failed to identify any adverse action she suffered, whether constructive discharge or otherwise, that could support a *prima facie* case under either the ADA or the FMLA; (ii) that Plaintiff's ADA claim also fails for lack of evidence that she was either disabled or regarded as such by her employer; and (iii) that, even assuming Plaintiff suffered some sort of adverse action, Defendant has identified legitimate, non-discriminatory and non-retaliatory business reasons for taking such action.  Plaintiff filed a response in opposition to this motion on December 20, 2005, contending:  (i) that Defendant did, in fact, constructively discharge her by impermissibly altering the terms and conditions of her employment upon her return from disability leave; and (ii) that she has also established the remaining elements of a *prima facie* case under both the ADA and the FMLA.  On January 13, 2006, Defendant filed a reply brief in further support of its motion.

The Court held a hearing on Defendant's motion on July 27, 2006.  Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and exhibits and the record as a whole, the Court now is prepared to rule on Defendant's motion.  This opinion and order sets forth the Court's rulings.

## II.  <u>FACTUAL BACKGROUND</u>

**A.    The Parties**

Defendant Gibralter Veterinary Hospital, Inc. was founded by Dr. Patrick Mech in 1985, and operates as a veterinary hospital in Gibralter, Michigan.  Dr. Mech continues to serve as Defendant's president, and his wife, Molly Mech, handles the company's payroll and accounts payable functions.  The hospital currently has about 55 employees.

Plaintiff Mary Torok was hired by Defendant in July of 2001 as the hospital's practice manager.  In this role, Plaintiff managed the hospital's day-to-day business operations, while Dr. Mech focused on his veterinary practice.  Plaintiff took over the practice manager position from Dr. Mech's sister, Kathleen Winn, who remained involved with the hospital as a part-time financial consultant.  Upon accepting this position, Plaintiff executed an employment contract that provided, among other things, that Defendant could terminate the employment relationship (i) "immediately if [Plaintiff] commit[ted] gross negligence or malfeasance in the performance of []her duties," or (ii) upon 14 days' written notice if Plaintiff "fail[ed] to perform managerial services and administrative obligations in accordance with this Agreement or as assigned by [Defendant's] Board of Directors."  (Defendant's Motion, Ex. 13, Employment Agreement at ¶¶ 4(c)(iii), 4(d).)

**B.    The Events Surrounding Plaintiff's Performance Review in March of 2003**

Although Plaintiff apparently made repeated requests for an evaluation of her job performance, the first such review evidently was conducted in March of 2003.  In

3

advance of this review, Kathleen Winn prepared a document that listed Plaintiff's job
responsibilities and suggested possible objectives for her to attain in the future. (See
Plaintiff's Response, Ex. 26A.)  At the top of this document, Winn observed that Plaintiff
had "*a lot* of tasks and employees she [wa]s responsible for," a "[t]ough job if you ask
me," and that Plaintiff was "sharp and conscientious." (Id.)  Similarly, Plaintiff prepared
a list of her accomplishments to date and her goals for the coming year. (See Plaintiff's
Response, Ex. 14A.)

Plaintiff's performance review was conducted on March 21, 2003, with Dr. Mech,
Kathleen Winn, Plaintiff, and another staff veterinarian, Dr. Gregory Raspbury, in
attendance, and with Molly Mech participating via telephone.  This session lasted a
couple of hours, with the parties generally in agreement that it was positive, productive,
and cooperative. (See Torok Dep. at 115-16; Raspbury Dep. at 155-56; Winn Dep. at
149.)[1]

At the conclusion of the meeting, Plaintiff was given a written evaluation form that
ranked various aspects of her job performance on a 1-to-5 scale. (See Defendant's
Motion, Ex. 14.)  Most of these rankings were in the 3-to-5 range, reflecting a
performance between "average" and "highly effective."  In a few areas, however, Plaintiff
received a ranking of "2" ("improvement needed") or "1" ("great improvement needed")
— she received the latter ranking, for example, in the areas of "[s]etting priorities and

_____

[1]Dr. Mech's deposition testimony on this point, as on most others, is largely unhelpful, as
he could not recall any of the specifics of this review session, nor could he recall the general
mood or tone of this meeting. (See Mech Dep. at 144, 149.)

budget[ing] time well" and in "[m]aintaining reliable presence within the practice."  (<u>Id.</u> at 4.)  While Dr. Raspbury did not believe that these more negative aspects of Plaintiff's job performance were discussed at the March 21 meeting, (<u>see</u> Raspbury Dep. at 56-57), Ms. Winn recalled that Plaintiff received criticism as to at least some of these matters, (<u>see</u> Winn Dep. at 150).  Winn agreed, however, that the principal goal of the session "was to discuss each issue and not zero in on a number."  (<u>Id.</u> at 148.)

## C.    Plaintiff's Disability Leave in the Summer of 2003

Plaintiff suffered a spinal fracture at the age of 16.  Twenty years later, at around the time she began to work for Defendant, she began experiencing lower back problems in connection with this longstanding injury.  In November of 2001, Plaintiff went on paid medical leave for approximately two months to have her spine fused.  Unfortunately, this fusion caused an adjacent disk to rupture in July of 2002, resulting in a second, unpaid medical leave of approximately two weeks to address this problem.

Despite these medical procedures, Plaintiff's spine continued to degenerate.  After consulting with a specialist in the spring of 2003, Plaintiff elected to proceed with major spine reconstruction surgery.  She planned to inform Dr. Mech of this decision at one of their regular update meetings, but before she could do so, Dr. Mech stated that he was happy with Plaintiff's performance and that he was giving her a five-percent salary increase.  (Plaintiff's Dep. at 340-41.)  Plaintiff responded that she "felt terrible" under these circumstances to inform Dr. Mech of her decision to proceed with another round of surgery, which would necessitate a longer, several-month leave of absence.  (<u>Id.</u> at 341.)

Plaintiff commenced this most recent leave of absence in May of 2003.  In preparation for this leave, she proposed a plan for other existing employees to handle her job responsibilities in her absence.  This plan incorporated a portion of a broader overhaul of Defendant's management structure that Plaintiff first had advocated back in October of 2002, but that had been implemented only in part.  Under this plan, which Defendant adopted, many of Plaintiff's duties were assumed by the current lab manager, Karen Shrake, and her remaining duties were assigned to the office manager, Rose Cummings.

Plaintiff envisioned, consistent with her earlier reorganization proposal, that Ms. Shrake would retain at least some of Plaintiff's former job responsibilities even after she returned from her disability leave, with Ms. Shrake given the new title of "project manager" to reflect her new duties.  Plaintiff further contemplated that she would return to the position of practice manager, but with a somewhat different set of duties as outlined in her earlier reorganization proposal.  Under this reorganized management structure, the newly created "project manager" position would continue to report to Plaintiff, just as Ms. Shrake presently reported to Plaintiff in her position as lab manager.

While Plaintiff was out on disability leave, she remained in frequent contact with the hospital staff, including Dr. Raspbury and Karen Shrake.  Through these and other contacts, Plaintiff became concerned that her relationship with Dr. Mech was changing. She was told by a fellow employee, for example, that Dr. Mech had directed the staff not to contact Plaintiff during her leave.  (See Plaintiff's Dep. at 136-38.)  In addition, when Plaintiff offered her assistance in helping the hospital staff to deal with the suicide of the

girlfriend of one of the veterinarians in an apartment located directly above the practice, she felt that Dr. Mech gave her "the cold shoulder" and "ignor[ed]" her.  (Id. at 149-50.) Even when Ms. Shrake called Plaintiff and expressly sought her assistance in getting the hospital staff through this difficult time, Plaintiff was directed by Dr. Mech not to return to the building for this purpose.  (See id. at 150-51.)  Moreover, when Plaintiff determined in early August that she perhaps was ready to return to work, despite her initial belief that she would not be able to resume her job until September or October, she was unable to get Dr. Mech to return her telephone calls to discuss the matter.  (See id. at 142-43.)

In addition, and unbeknownst to Plaintiff at the time, Kathleen Winn had entered into discussions with Defendant's attorneys concerning various issues relating to Plaintiff's return from her disability leave.  In particular, Plaintiff points to an electronic mail message sent from Winn to Dr. Mech on August 11, 2003 — around the same time that Plaintiff was attempting to contact Dr. Mech regarding her possible return to work:

> Hi — Had a couple of conversations with [Defendant's attorney's] office. We need to:
>
> A)  bring Mary back at comparable position at same pay.  D[i]rk Be[a]mer . . . advised that the closer a termination is to a return date, the more liable GVH [i.e., the Defendant hospital] would be (better target for a lawsuit).  If we needed to terminate Mary after her return, 4-6 months would be a reasonable elapse[d] period.
>
> I think we should define 3 or 4 positions.
>
>     1)  A Practice Manager (re-titled)[.]  T[h]is would be Karen — cannot be same exact job responsibilities that Mary

7

vacated

2)  A Mary job.  I think it should include specific We Care[2] training, implementation and enforcement goals.  Special projects with specific goals: Grooming and Lodging.

3)  The Lab/Surgical position.

4)  I'm not sure we need a Karen Assistant position — perhaps we can divvy up these responsibilities between 2) and 3)

B)  notify Mary that her leave is considered FMLA leave.  I have mailed a letter to her

C)  update our policies to say that, for "at will" employees, GVH reserves the right to terminate at our discretion.  Also need to post FMLA on site and reference in policy.  I'll get this going.

(Plaintiff's Response, Ex. 6.)  In response, Dr. Mech stated that Ms. Winn's policy suggestions "[s]eem[ed] simple," and he asked whether "we [can] get this implemented." (Id.)  He also requested that "we have a conversation concerning Mary," as he "need[ed] to make contact with her."  (Id.)[3]

As indicated in Kathleen Winn's e-mail message, she sent a letter to Plaintiff that same day, August 11, 2003, regarding the application of the FMLA to her current

----

[2]The parties refer frequently in their briefs to the "We Care" initiative, a quality improvement plan modeled after the "Safari" program developed by Dr. Steve Garner, a consultant from Texas.

[3]Again, Dr. Mech's deposition testimony on this subject is uninformative.  He could not recall receiving Winn's e-mail message, did not know whose idea it was for Winn to contact an attorney, and did not know whether the lawyer's advice was offered in response to a question whether Defendant could terminate Plaintiff's employment.  (See Mech Dep. at 193-96.)  He stated only that he was pleased with Ms. Shrake's performance as interim practice manager, and that her performance in that position "highlighted [Plaintiff's] inadequacies."  (Id. at 196.)

disability leave.  Specifically, Winn stated that she had "realized our obligation to document that your absence is being designated as FMLA . . . leave, effective today." (Plaintiff's Response, Ex. 7.)  Winn further stated that "[h]opefully by the time you receive this, you and [Dr. Mech] have spoken about your return date," and she requested that Plaintiff "provide a doctor's letter authorizing your return to full-time work."  (Id.)

The next day, August 12, 2003, Winn sent an e-mail message to Karen Shrake regarding "Management Positions," stating that "I'm anxious to talk to you and find out how you're feeling about a shake-up and your role in it."  (Plaintiff's Response, Ex. 5.) Winn proposed the creation of a "Hospital Manager" position, which would "include[] the personnel, scheduling, administrative etc. tasks you have been working on (minus some of [the] We Care stuff."  (Id.)  Similarly, on August 21, 2003, Dr. Mech sent an e-mail message to Winn and Shrake, seeking their views on several management job descriptions that were included as attachments to his message.  (Plaintiff's Response, Exs. 8, 8A.)

As her final evidence of an apparent change in Defendant's attitude toward her during her disability leave, Plaintiff cites certain portions of the deposition testimony of Dr. Raspbury.  The doctor recalled one meeting at which he, Dr. Mech, and others were present, when Dr. Mech "commented that he was unhappy with Mary's performance and he felt Karen [Shrake] [wa]s performing much better; also suggesting whether or not he's even going to bring Mary back after her medical leave."  (Raspbury Dep. at 66.)  Dr. Raspbury also testified about a meeting with Karen Shrake at which "she looked very

9

disturbed . . . and . . . mentioned that she was very uncomfortable with what was taking place," which the doctor took as a reference to Shrake's "transition into the practice management role" in Plaintiff's absence.  (Id. at 162-63.)

**D.      Plaintiff's Brief Return to Work Following Her Disability Leave**

On August 29, 2003, Plaintiff's physician provided her with a note authorizing her return to work on a half-day basis for two weeks, "to advance to full time as tolerated." (Defendant's Motion, Ex. 42.)  In accordance with this authorization, Plaintiff returned to work on a part-time basis immediately after Labor Day of 2003, with a planned resumption of full-time employment on September 22, 2003.

Immediately before her return to work, Plaintiff was invited to attend a September 5, 2003 meeting with Dr. Mech and Kathleen Winn.  According to Plaintiff, the purpose of this meeting was to "talk about . . . the management job descriptions" that had been developed and circulated in her absence, and more generally to "get up to speed so when I came back, I could just start working."  (Plaintiff's Dep. at 168-69.)  Plaintiff described Dr. Mech as not "as friendly" at this meeting, and she testified that "at the end of that meeting, Kathleen [Winn] had kind of warned me that I was coming back under negative circumstances so I should be careful."  (Id. at 168.)

On September 22, 2003, the scheduled date of her return to full-time work, Plaintiff instead stayed home to care for a sick child.  Upon arriving at work the next day, Plaintiff was told by several co-workers that "Dr. Mech just badmouthed you the entire day because you weren't here."  (Id. at 160.)  When Plaintiff sought to address this issue

10

with Dr. Mech, he stated that he "was going to write you up because you didn't call me yesterday," and Plaintiff responded that she had contacted the office manager, Rose Cummings, to report her absence.  (Id. at 161-62.)  According to Plaintiff, this had been the usual practice in the past, and she had never before "call[ed] Dr. Mech on a morning that I wouldn't be able to work."  (Id. at 205-06.)

Plaintiff claims that there were other changes in the terms of her employment upon her return from disability leave.  She cites, for example, a newly imposed requirement that all salaried employees punch a time clock, which she viewed as a "tracking measure[]" designed to "put a case together" that would justify her termination.  (See id. at 219-20, 350.)  Plaintiff also cites Defendant's decision to dock her pay for missing work on September 22, an action that, in her view, was inconsistent with both her salaried status and Defendant's past practice.  (See id. at 221.)  Karen Shrake also complained of this apparent change in policy in an October 13, 2003 e-mail message to Dr. Mech, Molly Mech, and Kathleen Winn, stating that "I can't help but feel that this policy is a response to your frustration with Mary."  (Plaintiff's Response, Ex. 10.)  In addition, Plaintiff testified that Dr. Mech and Kathleen Winn began to insist upon formal, written weekly updates of her progress on various tasks, a requirement that had not been rigorously enforced in the past.  (See Plaintiff's Dep. at 208, 350.)

More generally, Plaintiff perceived that she had less authority upon her return from disability leave.  Under the job descriptions circulated at the September 5, 2003 meeting, for example, the "Manager One" and "Manager Two" positions both reported to Dr.

11

Mech, suggesting, in Plaintiff's mind, that she and Karen Shrake now occupied lateral positions rather than Ms. Shrake being her subordinate.  (See id. at 344-45.)  Similarly, while Plaintiff previously had the authority to grant salary increases to her subordinates, with a requirement merely to "touch base" with Kathleen Winn before the increase took effect, she cites an incident after her return where Dr. Mech rescinded her promise of a pay increase and stated that "it would be nice if I check with the owner before I make promises like that."  (Id. at 189-90.)  In addition, Karen Shrake advised Plaintiff of Dr. Mech's instruction that Plaintiff's "work tasks be filtered through [Shrake] when [Plaintiff] returned," in contrast to Dr. Mech's past practice of talking directly to Plaintiff when he wished her to do something.  (Id. at 203-05.)

Beyond all this, Plaintiff learned shortly after her return about the e-mails exchanged among Dr. Mech, Kathleen Winn, and Karen Shrake during August of 2003 concerning Plaintiff's impending return from disability leave and Defendant's obligations under the FMLA.[4]  Then, on October 13, 2003, Ms. Shrake showed Plaintiff a copy of an e-mail message she had sent to Dr. Mech and Kathleen Winn that day, in which she referenced Winn's suggestion "that the 3 of us meet," with one of the topics of discussion being "Mary Torok and role of Practice Manager."  (Plaintiff's Response, Ex. 9.) Plaintiff construed this as an attempt to meet and discuss her role outside her presence,

--------

[4]All of these e-mail messages, including the ones exchanged between Dr. Mech and Kathleen Winn, apparently were copied to Karen Shrake, who was using Plaintiff's computer account while she served as interim practice manager in Plaintiff's absence.  When Plaintiff returned from her leave, she evidently discovered that these messages remained in her in-box.

and she sought permission to attend this meeting, which was scheduled for October 16, 2003.

In the interim, Plaintiff decided it would be better to meet individually with Dr. Mech, so that she could discuss her various concerns directly with him.  Accordingly, she spoke to Dr. Mech at around 9:00 a.m. on October 16, 2003, with Kathleen Winn also in attendance at her request.  At this meeting, Plaintiff confronted Dr. Mech and Ms. Winn with the e-mail messages they had exchanged in her absence, and she asked them to explain these messages.  Plaintiff described the ensuing exchange at her deposition:

> . . . I gave them a copy [of the e-mail messages] and I said, "I'd like someone to explain these to me."  And Dr. Mech started looking through it, and he instantly got p***ed off.  And I think I might have said something like, "I've felt that you've been very frustrated or angry with me for some[] time and I wanted to come up and lay things out to know what's going on.
>
> So he was sitting at the time and he instantly, he stood up and he walked around the desk, . . . and that's when he made the statement, "Well, I am frustrated.  I'm frustrated that two years ago I hired someone with a disability."  And I think I commented something of, you know, "I can't believe you're gonna use this as your excuse for treating me the way you've been treating me."
>
> And he — there was just no constructive conversation throughout the entire meeting.  He got angry and said, "Well, you're hunting through emails."  And I said, "Dr. Mech, I didn't have to hunt through anything.  They were sitting in my email box.  I wasn't digging through stuff and looking for things.  It was right in front of my face."
>
> And he was just, he was nasty.  I don't remember even really some of the — I think I was trying to make him explain himself because he kept, just pointing to other things that I was doing wrong, and I wasn't gonna let him.  I remember saying, "You need to explain this to me.  You need to sit down and tell me what happened and why this happened," and he wouldn't.  He just kind of kept making other, "You dig through emails."  And it got

kinda, it got nasty.  I mean we were back and forth and accusing each other of different things, I think.

(Plaintiff's Dep. at 236-38.)[5]

According to Plaintiff, Kathleen Winn sought to intervene and change the tone of the meeting, but to no avail:

> At one point, Kathleen tried to intervene.  She said, "Mary, I'm so sorry you've seen these [e-mail messages].  You're taking them way out of context.  It's not what you're thinking it is."  And I said something [like], "Kathleen, how can it not be what I'm thinking when blatantly you make reference to making Karen the practice manager?

> And I don't remember any more specific dialogue other than at one point, I mean Dr. Mech stood through this whole process, I think, and then he finally said or I think Kathleen kind of said, you know, "I guess I don't know where we go from here," and Dr. Mech was like, "I don't think we can.  I don't see how we can bridge this gap."

> And we both kind of sat for a minute.  And I truly think it came to a point where it was gonna be a technical thing.  I knew the implications of saying, "I'm quitting," and I think he knew the implications of him firing

---

[5]At her deposition, Ms. Winn did not recall Dr. Mech making any explicit reference to hiring someone with a disability or to Plaintiff's physical condition.  (Winn Dep. at 238-39.) She did recall, however, that "[w]e talked about the fact that she had come back from her medical leave — I mean she was still freshly back from her medical leave even though it had been a month."  (Id. at 238.)  Ms. Winn further testified that Dr. Mech had expressed his "frustrat[ion]" with Plaintiff, "[p]articularly referring to the fact that her second day back to work or whatever the day was as full time from her medical leave, she was not at the practice. He said I need a practice manager here."  (Id.)

Characteristically, Dr. Mech's recollection of the discussion at the meeting is considerably less detailed.  Asked to recount everything that he could recall about that occasion, he responded, "I remember Mary being upset, flashing an email at me, and resigning."  (Mech Dep. at 262.)  Dr. Mech could not recall what Plaintiff had said about the e-mail, did not have any understanding at the time of why she might have been upset about it, and did not recall that he made any effort to make Plaintiff feel better, calm her down, or help her to put matters into perspective.  (Id. at 265-66.)  At most, he "may have said something [like], 'I'm sorry you're upset,'" but he "d[id]n't remember specifics" as to any such remark.  (Id. at 265.)

me, so I truly believe that the silence was both of us trying to figure out who was gonna make — and at that point I was so upset, I just wanted to get the heck out, so I just finally said, "I don't see any other choice than for me to leave."

And I remember him specifically saying, "So are you telling me that you want to resign?" And I know it was, it was a specific question like he wanted to make sure he asked me that question so that it was clear that he was not firing me is what I took from that.

Q:     What did you say?

A:      And I said, "I don't see any other choice that I've got."

(Plaintiff's Dep. at 238-39.)

Ms. Winn's account of this portion of the meeting is similar. She could not recall what, if anything, Dr. Mech might have said on the issue of the e-mail messages, but she "explained to Mary that [her e-mail to Dr. Mech] was my attempt to clarify our responsibility as her employer to her at her return [from] her leave," and she "attempted to explain" that her e-mail did not reflect "an effort to get rid of her or demote her." (Winn Dep. at 237.) More generally, Winn testified that she "was upset that this email had been misconstrued," and "that Mary saw the email in the first place because it wasn't intended for her or Karen [Shrake] to see it." (Id. at 241.) Winn further explained that she was "frustrated that my personal efforts at working very hard to find a management structure that would work best for the hospital . . . w[ere] not working" and were being derailed by "[l]ittle stuff" and a failure to "see[] the forest [for] the trees." (Id. at 241-42.) Because of this frustration and her belief that Plaintiff was viewing her e-mail message "out of context," Winn "felt that it was very important to smooth the waters and make

15

sure she understood the contents of this email."  (Id. at 243.)  Despite these efforts, however, Plaintiff expressed her view that "she couldn't continue on with the relationship that she felt stood at the time," and Winn made no further attempt at this point to urge her to stay and try to work things out.  (Id. at 239.)[6]

Plaintiff then returned to her office, gathered her belongings, and left.  Although she had offered at the conclusion of her meeting with Dr. Mech to remain on the job for two more weeks, Dr. Mech came down to her office, stated that he saw no "reason for you . . . to stay the two weeks," and asked her to "gather your things and . . . leave now." (Plaintiff's Dep. at 239-40.)  This lawsuit followed, with Plaintiff asserting that she was constructively discharged in violation of the ADA, the FMLA, and the terms of her employment contract.

## III.  ANALYSIS

### A.  The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks an award of summary judgment in its favor on both Plaintiff's federal ADA and FMLA claims and her state-law breach-of-contract claim.  Under the pertinent Federal Rule, summary judgment is proper "if the

---

[6]For his part, Dr. Mech could not recall whether Ms. Winn made any effort to explain the e-mail messages or otherwise resolve the parties' differences in any way.  (See Mech Dep. at 264.)  Nor could he recall making any statement regarding an inability to bridge a gap between himself and Plaintiff.  (See id. at 264.)  Rather, he explained that he likely said little or nothing during the meeting because he "do[es]n't like hostility," and because, in his experience, "when somebody quits, I've never had much success in sitting there and trying to talk them out of it." (Id. at 265.)  Dr. Mech observed that "historically I tend, in most cases, to stay rather quiet when these things are going on, let them vent, and she resigned."  (Id.)

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] According to the Celotex Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

---

[7]"[T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure, § 2727, at 468 (1998) (footnote omitted).

17

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989).  See also

Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994).  The Court will apply these

standards in resolving Defendant's motion.

**B.     Issues of Fact Remain as to Plaintiff's Claim of Constructive Discharge.**

Although Plaintiff alleges that Defendant violated the ADA, the FMLA, and the

terms of her employment contract in a number of respects, her principal claim is that she

was constructively discharged.  Plaintiff further alleges, in turn, that this constructive

discharge constituted both a retaliation against and an interference with Plaintiff's

exercise of the right to disability leave as protected by the FMLA, as well as an act of

discrimination on account of Plaintiff's actual or perceived disability in violation of the

ADA, and a termination without cause in violation of the parties' employment agreement.

As one ground for seeking summary judgment in its favor on each of Plaintiff's claims,

Defendant challenges this common element of all of her claims, contending that Plaintiff

has failed as a matter of law to establish that she was constructively discharged.  The

18

Court cannot agree.

The FMLA declares it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  In determining whether Defendant violated this provision, at least in the absence of direct evidence of such a violation,[8] the Court applies the familiar tripartite analytical framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  See Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 315 (6th Cir. 2001); Stubl v. T.A. Systems, Inc., 984 F. Supp. 1075, 1090 (E.D. Mich. 1997).  To proceed past the first stage of this analysis, Plaintiff must establish a prima facie case by showing (1) that she engaged in conduct protected by the FMLA, (2) that Defendant was aware of this exercise of protected rights, (3) that Defendant thereafter took an employment action adverse to Plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action.  See Skrjanc, 272 F.3d at 314; Stubl, 984 F. Supp. at 1090.

The basic legal principles governing Plaintiff's ADA claim are similar.  Again, the McDonnell Douglas framework applies to this claim, at least absent direct evidence of discriminatory animus.  See Hedrick v. Western Reserve Care System, 355 F.3d 444, 453 (6th Cir. 2004).  At the first step of this analysis, Plaintiff must establish a prima facie case of disability discrimination under the ADA by  showing (1) that she is an individual

_____

[8]This issue of direct evidence is addressed below, insofar as it is necessary to the resolution of Defendant's motion.

19

with a disability within the meaning of the federal statute; (2) that she was otherwise

qualified to perform the requirements of her job, with or without reasonable

accommodation; and (3) that she was denied a reasonable accommodation of her

disability, or otherwise suffered an adverse employment decision because of her

disability. See Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002); Burns v. Coca-Cola

Enterprises, Inc., 222 F.3d 247, 253 (6th Cir. 2000).

Defendant's motion challenges the "adverse action" prong, among others, of

Plaintiff's prima facie case under both the FMLA and the ADA. In particular, Defendant

contests the principal "adverse action" claimed by Plaintiff in her complaint — namely,

that she was constructively discharged. Under Sixth Circuit precedent, "a constructive

discharge exists if working conditions are such that a reasonable person in the plaintiff's

shoes would feel compelled to resign." Scott v. Goodyear Tire & Rubber Co., 160 F.3d

1121, 1127 (6th Cir. 1998) (internal quotation marks and citation omitted). In

determining whether such working conditions were present, the Court must assess the

circumstances "objectively," and "without consideration of [the employee's] undue

sensitivities." Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991).

Plaintiff also must produce evidence from which the trier of fact could conclude that

Defendant deliberately created these intolerable working conditions "with the intention of

forcing [her] to quit." Moore v. Kuka Welding Systems, 171 F.3d 1073, 1080 (6th Cir.

1999).

Although Plaintiff contends in her response to Defendant's motion that "[t]his case

20

is *sui generic* [sic] factually," the Court need not look far to identify a prior decision involving somewhat analogous facts.  In particular, in <u>Saroli v. Automation & Modular Components, Inc.</u>, 405 F.3d 446 (6th Cir. 2005), plaintiff Marria Saroli successfully appealed this Court's determination that she had not been constructively discharged upon her return from a pregnancy and maternity leave governed by the FMLA.  This Court's ruling rested principally on the ground that Ms. Saroli had acted too hastily in resigning on the first day following her return from leave, without waiting to see precisely what working conditions she would have faced upon resuming her employment.  At that point, Ms. Saroli had been told by the company's owner, Richard Shore, that she "probably" would be demoted, but no definitive decision had yet been made about the exact terms and conditions of her continued employment.  Under these circumstances, this Court found that Ms. Saroli's claim of constructive discharge impermissibly rested upon the mere prospect, rather than the actual existence, of intolerable working conditions.

The Sixth Circuit reversed this ruling, finding that "Saroli has raised a genuine issue of material fact as to whether she was constructively discharged from her employment."  <u>Saroli</u>, 405 F.3d at 452.  The Court explained:

> Of primary importance is the fact that Shore's words and actions made clear to Saroli that she ought to consider resigning because if she chose to remain at the company she would "probably" be demoted.  It is reasonable to infer that such a demotion would likely have resulted in a reduction in job responsibilities for Saroli and perhaps a reduction in salary.
>
> The mere fact that a demotion would have "probably" occurred if Saroli had not resigned is by itself insufficient to raise a genuine issue as to whether a constructive discharge occurred in this case.  There is other

21

circumstantial evidence, however, that indicates that a reasonable person in Saroli's position would have felt that Shore created an intolerable working environment with the intent of forcing Saroli to resign.  When this evidence is considered in its totality, along with . . . Saroli's probable demotion, we believe that Saroli has presented sufficient evidence to defeat the defendants' motion for summary judgment.

From the outset, Shore made the process of obtaining maternity leave exceedingly difficult, which "led to a lot of stress" for Saroli.  Shore refused numerous attempts by Saroli to ascertain the maternity leave which would be offered to her.  Shore also made comments which indicated his displeasure with her attempt to exercise her right to maternity leave and indicated that Shore felt maternity leave ought to be treated differently from other forms of medical leave such as illness.  Shore's statements during his deposition indicate that this displeasure with Saroli could be based on his, and by extension the company's, disparaging views toward women.  For example, during his deposition, Shore referred to the "girls" at the company six times and did not once use the words female or women to describe his employees.  Additionally, there were no pregnant employees at the company nor any maternity-leave policy at the company prior to Saroli's request for leave.

Shore's actions after he learned that Saroli would be requesting maternity leave could also be viewed as evidence that Shore intended to create an intolerable working environment in order to induce Saroli to quit.  The day after Saroli submitted to Shore a written request for maternity leave, Shore informed her that his son had been hired as the manager of accounting and finance.  Furthermore, Shore told Saroli that she would now be reporting to Shore's son, with whom Saroli had unpleasant past interactions, including on several occasions, his expressing the belief that eventually he would have her job.  Prior to this change, Saroli held the highest level position in the company's financial department and had reported directly to the company's owners.  According to Saroli, Shore's son then began to assume many of the duties that Saroli had previously performed.

Finally, Shore's conduct when Saroli attempted to return to work at the conclusion of her maternity leave suggests that he neither expected nor desired her to return to the company.  Shore failed to inform Saroli until the day she returned to work that she would need a doctor's note in order to be cleared to resume work.  Saroli also found upon her return that her

computer account had not been reactivated and her work had been taken from her desk.  As a result of these problems, Saroli was unable to resume her usual job tasks until approximately 3:30 p.m., at which point she was summoned by Shore into a meeting about the future of her employment at the company.

At this meeting Shore's actions indicated his desire to have Saroli resign from her position at the company.  Shore laid out Saroli's options in the following order: (1) Saroli could resign and obtain a severance package, (2) she could remain employed at the company for sixty to ninety days while she looked for alternate employment and then resign, or (3) she could stay at the company in an undetermined role.  When Saroli expressed her desire to remain at the company, Shore then indicated that she would "probably" be demoted if she remained.  Shore refused, however, to elaborate on what her new role at the company would entail.

In sum, based upon the evidence introduced by Saroli as to [the defendant employer's] actions towards her both prior to and following her maternity leave, we conclude that Saroli has raised a genuine issue as to whether she was constructively discharged.

Saroli, 405 F.3d at 452-53 (citation omitted).

While the facts here and in Saroli plainly are not identical, this Court views them as sufficiently analogous to at least suggest the proper disposition of Defendant's present motion.  To be sure, there is no evidence in this case, as there was in Saroli, that Plaintiff encountered any difficulties or resistance in securing her requested disability leave in the summer of 2003.  To the contrary, Defendant not only granted this leave — and, in fact, loaned Plaintiff money "to make [her] life easier" and reduce her "financial stress" during her leave, (Plaintiff's Dep. at 232-33) — but largely adopted Plaintiff's various recommendations as to who should assume her job responsibilities in her absence.

Yet, the record here includes evidence which, viewed in a light most favorable to

23

Plaintiff, suggests that Defendant's generally positive view of her and her work began to change during the course of her leave. Plaintiff has testified, for example, that she learned from a co-worker that Dr. Mech had directed the hospital staff not to contact her during her leave. Plaintiff further testified that she had difficulty in getting Dr. Mech to return her calls to discuss the timing and terms of her return from this leave. In addition, Plaintiff recounted how Dr. Mech had rebuffed her offers of assistance following a suicide in an apartment located directly above the veterinary practice. The record also includes Kathleen Winn's August 11, 2003 letter to Plaintiff in which she designated her current leave as governed by the FMLA, and informed Plaintiff, apparently for the first time, that she would need to produce a letter from her doctor authorizing her return to work. See Saroli, 405 F.3d at 454 (citing the FMLA regulations that require proper notice of any obligation to produce a fitness-for-duty certification); see also 29 C.F.R. § 825.310(e) (providing that such notice generally must be given "either at the time notice of the need for leave is given or immediately after leave commences").

Plaintiff also has produced evidence of discussions among Defendant's management during her disability leave regarding the conditions under which Plaintiff would resume work following this leave — and, indeed, whether Plaintiff would return to work at all. Dr. Raspbury testified, for example, that Dr. Mech had expressed his dissatisfaction with Plaintiff's job performance, and suggested the possibility that she might not be brought back to work at the conclusion of her leave. He further recounted a conversation in which Karen Shrake expressed her discomfort about her apparent

24

transition into Plaintiff's former role as practice manager in Plaintiff's absence.

Most significantly, the e-mail messages exchanged during Plaintiff's leave, if viewed in a light most favorable to Plaintiff, could readily be construed as reflecting a growing dissatisfaction with Plaintiff's job performance that was not evident before her leave.  Shortly before this leave, Plaintiff had received an evaluation that was regarded by all as generally favorable and positive, albeit with concerns expressed as to a few aspects of her job performance — concerns which notably did not prevent Dr. Mech from awarding Plaintiff a raise.  Yet, in an August 12, 2003 e-mail message, Kathleen Winn sought Karen Shrake's views as to a possible "shake-up and your role in it," (Plaintiff's Response, Ex. 5), and this e-mail was followed shortly thereafter by an e-mail message from Dr. Mech seeking Winn's and Shrake's views as to several management job descriptions that he recently had drafted, (see Plaintiff's Response, Exs. 8, 8A).  While Defendant correctly points out that Plaintiff herself had proposed an overhaul of the hospital's management structure and a reallocation of tasks among existing and new management positions, a trier of fact could reasonably place significance on the fact that Defendant began to seriously explore these matters only *during* Plaintiff's leave, and not in the several months between Plaintiff's initial proposal in October of 2002 and her leave in May of 2003.

And, of course, Plaintiff has produced Kathleen Winn's August 11, 2003 e-mail message to Dr. Mech, in which she relayed the advice of Defendant's attorney and expressed her views as to how Plaintiff's return to work should be handled in light of this

advice.  While she acknowledged that the hospital "need[ed] to . . . bring Mary back at comparable position at same pay," she stated in the very next sentences that "the closer a termination is to a return date, the more liable GVH would be (better target for a lawsuit)," so that "[i]f we needed to terminate Mary after her return, 4-6 months would be a reasonable elapse[d] period."  (Plaintiff's Response, Ex. 6.)  Winn also proposed a restructuring of management positions in which Defendant would "re-title[]" the practice manager position and assign it to Karen Shrake, taking care not to give this position the "same exact job responsibilities that Mary vacated."  (Id.)  Again, a trier of fact certainly would be permitted to construe this message as reflecting Defendant's contemplation that Plaintiff would be terminated upon her return from leave, and its consideration of ways in which this could be done without running afoul of the FMLA — a rather stark contrast from Plaintiff's generally favorable performance review and pay increase shortly before her leave.

Turning, finally, to the events following Plaintiff's return to work, Plaintiff has produced evidence which, viewed favorably to her, reflects both (i) actual, detrimental changes in the terms and conditions of her employment, and (ii) Defendant's deliberate intent to bring about these changes for the purpose of forcing Plaintiff to resign.  As to the former, Plaintiff testified that Kathleen Winn warned her at a meeting just prior to her return from leave that she was "coming back under negative circumstances [and] should be careful."  (Plaintiff's Dep. at 168.)  Plaintiff also identified various purported deviations from Defendant's past practices following her return from leave, including:  (i)

26

the admonishment she received from Dr. Mech for failing to call him directly to report

her September 22, 2003 absence from work, where Plaintiff instead reported her absence

to the office manager as she purportedly had done in the past; (ii) the docking of her pay

for this absence, a policy change that Karen Shrake viewed as "a response to

[Defendant's] frustration with Mary," (Plaintiff's Response, Ex. 10); (iii) a newly

established requirement that salaried employees punch a time clock; and (iv) a new,

rigorous insistence that Plaintiff provide written weekly progress reports.

    In addition, and most significantly, Plaintiff has produced evidence of alterations

in Defendant's chain of command, including:  (i) Dr. Mech's purported instruction to

Karen Shrake that all of Plaintiff's work tasks would be filtered through Shrake upon

Plaintiff's return from her leave; (ii) Plaintiff's apparent loss of her previous authority to

grant salary increases to her subordinates; and (iii) the circulation and discussion of new

management job descriptions, under which Plaintiff would at best be lateral to, and

perhaps would report to, her former subordinate, Ms. Shrake.  To be sure, Defendant

points to Plaintiff's acknowledgment at her deposition that at least some of these changes

were consistent with Plaintiff's own management restructuring proposal circulated in

October of 2002.  Nonetheless, under the totality of the evidence in the record, the Court

believes that it should be left to the trier of fact to determine whether the changes in the

terms and conditions of Plaintiff's employment upon her return from leave were

tantamount to a demotion or otherwise were sufficiently detrimental to support a claim of

constructive discharge, or whether these changes instead reflected a permissible effort to

27

restructure management for legitimate business purposes.

Finally, the Court finds sufficient evidence in the record from which a trier of fact could reasonably conclude that Defendant acted with the intent to force Plaintiff to resign. First, and as discussed earlier, Ms. Winn's August 11, 2003 e-mail message to Dr. Mech can readily be construed as proposing the means through which Plaintiff's employment could be terminated without running afoul of the FMLA. While such a scheme, if successfully implemented for nondiscriminatory and non-retaliatory purposes, presumably would be permissible under the FMLA and the ADA, Winn's e-mail nonetheless appears to contemplate the termination of Plaintiff's employment, and thus would support the inference that the ensuing changes in Plaintiff's working conditions were made with an eye toward securing this objective. This inference gains further support in the evidence (i) that Plaintiff seemingly was excluded from the October 16, 2003 meeting at which Dr. Mech, Ms. Winn, and Ms. Shrake apparently planned to discuss Plaintiff's status and the practice manager position, (ii) that Dr. Mech, at least, declined to offer any reassurance or explanation during his October 16 meeting with Plaintiff as to why the e-mails exchanged in Plaintiff's absence did not reflect a desire to terminate her employment, and (iii) that, in lieu of such an explanation, Dr. Mech instead allegedly expressed his frustration that he had "hired someone with a disability," (Plaintiff's Dep. at 237).

In light of this record, the Court finds that Plaintiff's evidence here is at least as supportive of a claim of constructive discharge (and likely more so) as the evidence

28

presented in <u>Saroli</u>.  As noted earlier, <u>Saroli</u> featured evidence of the employer's initial resistance to a leave that is not present here.  Yet, the record in this case, in contrast to <u>Saroli</u>, includes considerable evidence of Defendant's growing dissatisfaction with Plaintiff and contemplation of her termination while she remained away on leave.  In addition, the plaintiff in <u>Saroli</u> generally confronted only the ***prospect*** of less favorable working conditions upon her return to work, while Plaintiff here has identified actual, concrete changes in her post-leave work environment, authority, and obligations.  While Defendant seeks to downplay the significance of these changes and argues that they were motivated by legitimate purposes, such claims as to the proper interpretation and weight of the evidence must be left to the trier of fact, and cannot be resolved by the Court on a summary judgment motion.  Accordingly, the Court finds that Defendant is not entitled to summary judgment in its favor on the issue of constructive discharge.[9]

## C.    Plaintiff Has Established the Remaining Elements of a Prima Facie Case of Retaliatory Discharge Under the FMLA.

In its present motion, Defendant challenges Plaintiff's FMLA retaliation claim on the principal ground that Plaintiff's separation from employment resulted from a voluntary resignation rather than a constructive discharge.  Having resolved this issue in Plaintiff's favor, the Court readily concludes that Plaintiff has established the three remaining elements of her prima facie case under the FMLA, and that Defendant is not

----

[9]Having determined that the evidence is sufficient to sustain Plaintiff's claim of constructive discharge, the Court need not decide whether Plaintiff has identified any other adverse actions that would satisfy this element of her prima facie case under the FMLA and the ADA.

entitled to summary judgment in its favor on the two remaining prongs of the McDonnell Douglas standard.

As stated earlier, the four elements that Plaintiff must satisfy at the first stage of the McDonnell Douglas analysis in order to establish a prima facie case of retaliatory discharge under the FMLA are:  (1) that she engaged in conduct protected by the FMLA, (2) that Defendant was aware of this exercise of protected rights, (3) that Defendant thereafter took an employment action adverse to Plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action.  See Skrjanc, 272 F.3d at 314.[10]  There is no dispute that Plaintiff's disability leave in the summer of 2003 was "protected conduct" under the FMLA, and that Defendant was aware of this exercise of protected rights.  In addition, the Court already has held that issues of fact remain as to whether Plaintiff suffered an adverse action in the form of a constructive discharge.

Thus, the Court turns to the question whether Plaintiff has produced evidence of a causal connection between her disability leave and her constructive discharge.  There is no doubt that she has.  First, the close proximity in time between Plaintiff's return from

---

[10]Plaintiff's complaint seemingly advances two FMLA-based theories of recovery, retaliation and interference.  As to the latter, Defendant argues in its motion that Plaintiff has failed to identify any interference with the exercise of her rights under the FMLA, where Defendant granted her request for a disability leave.  (See Defendant's Motion, Br. in Support at 18-19.)  Plaintiff has utterly failed to address this issue in her response to Defendant's motion, but instead focuses her discussion and argument solely on her claim of retaliatory discharge. (See Plaintiff's Response Br. at 29-33.)  Thus, it appears that Plaintiff has abandoned her FMLA interference claim, and the Court need not address it any further in this opinion.

her disability leave and her constructive discharge just a few weeks later is indicative of a causal connection between the two. See Skrjanc, 272 F.3d at 314. In addition, Kathleen Winn's August 11, 2003 e-mail message to Dr. Mech is highly suggestive, at least, of a direct causal link between Plaintiff's disability leave and her contemplated termination at some point after her return. Finally, Dr. Mech's purported statement at his final meeting with Plaintiff regarding his "frustrat[ion] that two years ago I hired someone with a disability," (Plaintiff's Dep. at 237), can readily be construed as reflecting his growing dissatisfaction with Plaintiff's job performance as a result of her disability leaves. All of this is more than enough to meet the fairly modest "prima facie" standard for going forward with an FMLA claim of retaliatory discharge.

This leaves only Defendant's fairly weak assertion, offered almost as an afterthought in its motion, that it has articulated legitimate, non-retaliatory reasons for its actions, and that Plaintiff has failed to produce evidence that these reasons are pretextual. True enough, Defendant has produced evidence that Plaintiff's most recent evaluation, while generally favorable, identified significant deficiencies in certain aspects of her job performance. It is also true, as Defendant points out, that at least some of the additional conditions imposed upon Plaintiff following her return from leave could conceivably be traced to these documented deficiencies — the requirement to punch a time clock, for example, arguably could have been intended to address the low mark in Plaintiff's evaluation for "[m]aintaining [a] reliable presence within the practice." (Defendant's Motion, Ex. 14 at 4.) Finally, Defendant cites legitimate business reasons for its desire to

restructure its management team, and points to Plaintiff's own recognition in her October 2002 proposal that some such reorganization and reshuffling of job responsibilities would be appropriate.

Yet, there is evidence in the record that raises issues of fact as to the possibly pretextual nature of each of these claimed justifications for Defendant's actions. First, although Plaintiff's written evaluation in March of 2003 revealed deficiencies in certain aspects of her job performance, Defendant nonetheless waited until *after* Plaintiff's return from her disability leave to impose measures purportedly directed at these deficiencies, rather than imposing them in the several weeks between her evaluation and the commencement of her leave. Similarly, while Plaintiff circulated her management restructuring proposal in October of 2002, a trier of fact could find it significant that Defendant waited until *after* Plaintiff's return from her leave to decide that it was time to alter its management structure and place Plaintiff and Karen Shrake in lateral positions. Next, and perhaps most significantly, there is Kathleen Winn's August 11, 2003 e-mail message sent during Plaintiff's leave, which, as discussed earlier, could be construed as an effort to lay the groundwork for Plaintiff's dismissal upon her return — and, of course, the events that actually unfolded when Plaintiff returned to her job lend a certain credence to this interpretation. Finally, Dr. Mech's purported statement of his frustration that he "hired someone with a disability" would certainly tend to suggest that other claimed bases for his frustration with Plaintiff are pretextual.

In light of this evidence, the resolution of the question of pretext turns upon an

32

assessment of the veracity of Defendant's explanations for its actions.[11]  Kathleen Winn

has testified, for example, that her August 11, 2003 e-mail message must be viewed in its

proper context, and that it merely reflects an employer's legitimate efforts to comply with

its obligations under the FMLA.  Such matters going to the weight of the evidence,

however, must be left for the trier of fact to determine.  Consequently, the Court finds that

Defendant is not entitled to summary judgment in its favor on Plaintiff's FMLA claim of

retaliatory discharge.[12]

**D.     Plaintiff Has Failed to Produce Evidence that She Was Disabled or Was
Regarded As Such by Defendant.**

The Court now returns to Plaintiff's claim of disability discrimination under the

ADA.  As explained earlier, the "adverse action" prong of Plaintiff's prima facie case of

disability discrimination, like the analogous element of her prima facie case of retaliation

under the FMLA, is established through the evidence that Plaintiff was constructively

discharged.  Nonetheless, apart from challenging Plaintiff's proof of an "adverse action,"

Defendant further contends that Plaintiff has failed to establish the remaining elements of

her prima facie case under the ADA.  In response, Plaintiff asserts that the record here

------

[11]The Court notes that Defendant is at somewhat of a disadvantage in this regard, where
its chief decisionmaker, Dr. Mech, seemingly does not recall many of the incidents at issue in
this case, much less recollect why he might have taken the actions or made the decisions that he
did.

[12]Having determined that Plaintiff's FMLA claim survives scrutiny under the McDonnell
Douglas framework, the Court need not decide whether Plaintiff also has produced direct
evidence of retaliatory intent that would obviate the need to engage in a McDonnell Douglas
analysis.

provides sufficient support for her ADA claim under either a direct or a <u>McDonnell Douglas</u>-based analytical approach.  The Court finds that Defendant has the better of the argument on this issue.

Whether Plaintiff proceeds under the "direct evidence" or the <u>McDonnell Douglas</u> burden-shifting mode of analysis, she cannot succeed on an ADA claim of disability discrimination absent a showing that she is "disabled" within the meaning of the statute. <u>See</u> <u>Hedrick</u>, 355 F.3d at 452 (explaining that "in cases where the plaintiff presents direct evidence of disability discrimination," he or she still "bears the burden of establishing that he or she is disabled"); <u>Mahon</u>, 295 F.3d at 589 (confirming that this also is the first prong of a prima facie case under the <u>McDonnell Douglas</u> standard); <u>Monette v. Electronic Data Systems Corp.</u>, 90 F.3d 1173, 1182, 1186 (6th Cir. 1996) (emphasizing that a plaintiff must establish that she is disabled even where she has produced direct evidence of discriminatory intent).[13]  The ADA defines a "disability" as:

> (A)  a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B)  a record of such an impairment; or

> (C)  being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Plaintiff suggests that the evidence here satisfies both prongs (A) and (C) of this

---

[13]In light of the above-cited ADA decisions that set forth the elements of a plaintiff's case under the "direct evidence" mode of proof, the Court does not understand Plaintiff's confusion as to "[w]hether the direct evidence model applies to cases under the ADA" under the law of this Circuit.  (Plaintiff's Response Br. at 34.)  It is quite clear that this avenue of proof is available.

statutory definition.  Regarding the former, she contends that she is "substantially limit[ed]" in the "major life activit[y]" of "performing manual tasks," which has been recognized as a "major life activity" in the pertinent EEOC regulations.  See 29 C.F.R. §1630.2(i).  As the Supreme Court recently explained, in order "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives," and "[t]he impairment's impact must also be permanent or long term."  Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 198, 122 S. Ct. 681, 691 (2002).

In an effort to make this showing here, Plaintiff cites her inability to sit, lie on her left side, or garden for prolonged periods; her difficulty in driving; her inability to go camping, go on amusement park rides, or take her yearly canoe trip; her avoidance of carrying laundry up or down stairs; her decreased sexual relations with her husband; and her general difficulty in doing tasks that once were effortless.  Yet, as noted by Defendant, the Court in Williams addressed a comparable record, which disclosed that the plaintiff's "medical conditions caused her to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances."  Williams, 534 U.S. at 202, 122 S. Ct. at 694.  This record further revealed, however, that "even after her condition worsened, [the plaintiff] could still brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house."  534 U.S. at 202, 122 S. Ct. at 694.  The Court

35

further noted the plaintiff's admission that "she was able to do the manual tasks required

by her original two jobs."  Upon reviewing this record, the Court concluded that it did not

demonstrate "such severe restrictions in the activities that are of central importance to

most people's daily lives that they establish a manual task disability as a matter of law."

534 U.S. at 202, 122 S. Ct. at 694.

This Court reaches the same conclusion under the similar record presented here.

Most of the activities described by Plaintiff, such as camping, canoeing, and gardening,

cannot be characterized as "of central importance to most people's daily lives."

Moreover, most of the limitations that Plaintiff has cited are fairly modest in degree —

her inability to participate in certain activities for prolonged periods, for example — and

thus do not meet the requirement that an impairment altogether "prevents or severely

restricts" an individual's engagement in the identified activities.  And, of course, Plaintiff

here, like the plaintiff in Williams, does not claim any inability to perform the manual

tasks that were required to carry out her duties as Defendant's practice manager.

Accordingly, the Court finds that Plaintiff has failed to establish that she is "disabled"

within the first prong of the ADA definition of that term.

Nonetheless, Plaintiff asserts that she was "regarded as" disabled, which provides

a separate ground for satisfying the statutory standard.  Again, the Supreme Court

recently addressed this variant of "disability" under the ADA, explaining:

> Under subsection (C), individuals who are "regarded as" having a disability
> are disabled within the meaning of the ADA.  See [42 U.S.C.] §
> 12102(2)(C).  Subsection (C) provides that having a disability includes

36

"being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," § 12102(2)(A).  There are two apparent ways in which individuals may fall within this statutory definition:  (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual — it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 2149-50 (1999).

Although Plaintiff is not entirely clear in her response as to what evidence might show that Defendant regarded her as disabled, she apparently relies principally, if not solely, on Dr. Mech's statement at their final meeting that he had "hired someone with a disability."  Yet, his use of the word "disability" does not ineluctably lead to the conclusion that he regarded Plaintiff as "disabled" *as that term is defined under the ADA* — namely, as suffering from impairments that substantially limited one or more major life activities.  As is clear from Sutton, only this latter sort of misperception satisfies the "regarded as" prong of the statutory definition of "disabled."

On this crucial point, Plaintiff has no evidence to offer.  Again, the sole "major life activity" upon which she relies in this case is the performance of manual tasks.  Yet, there is no evidence that Dr. Mech (or anyone else within Defendant's management) even *knew* of the limitations Plaintiff was experiencing in such non-work activities as canoeing, camping, gardening, and the like, much less that he or other management officials

37

regarded Plaintiff as "prevent[ed] or severely restrict[ed] . . . from doing activities that are of central importance to most people's daily lives."  Williams, 534 U.S. at 198, 122 S. Ct. at 691.  The record simply fails to indicate that Defendant formed any sort of belief on this subject, mistaken or otherwise.  Nor, more generally, is there any evidence of Defendant's belief that Plaintiff's spinal condition substantially limited some other major life activity or significantly impaired her ability to perform the functions of her job.

Indeed, even Plaintiff herself downplays Dr. Mech's reference to a "disability," opining that she "assumed or knew" at the time that "it wasn't my poor spine that he was frustrated with."  (Plaintiff's Dep. at 243.)  Rather, Plaintiff testified to her belief that Dr. Mech was "frustrated with other things that he had never been able to talk to me about," and that "instead of being honest, finally, and getting it on the table, he was using my disability, what he referred to as my disability[,] as the reason why he was frustrated." (Id.)  Whether or not Plaintiff's assessment on this point is accurate, it is at least clear that the record lacks evidence that Defendant "regarded" Plaintiff as "disabled" within the meaning of the ADA.  It follows that Defendant is entitled to summary judgment in its favor on Plaintiff's claim of disability discrimination.[14]

**E.    Defendant Is Not Entitled to Summary Judgment in Its Favor on Plaintiff's**

---

[14]Notably, Plaintiff further opined at her deposition that Dr. Mech's reference to "disability" could be taken, at least in part, as reflecting his underlying concern that Plaintiff's condition might be "ongoing" and might necessitate "additional leaves."  (Plaintiff's Dep. at 244.)  Assuming that this is a fair reading of the record, the Court notes that Plaintiff's claim under the FMLA would appear to be an adequate vehicle for vindicating Plaintiff's right to be free from adverse treatment as a result of her occasional need for disability leaves to obtain medical treatment for her spinal condition.

**Breach-of-Contract Claim.**

Finally, Defendant challenges Plaintiff's state-law breach-of-contract claim on two grounds. First, Defendant asserts that this claim must fail in light of Plaintiff's voluntary resignation from her position. Alternatively, even if Plaintiff could show that she was constructively discharged, Defendant maintains that there was just cause to terminate Plaintiff's employment, in light of the provision in her contract permitting termination upon 14 days' notice if she "fail[ed] to perform managerial services and administrative obligations in accordance with this Agreement or as assigned by [Defendant's] Board of Directors." (Defendant's Motion, Ex. 13, Employment Agreement at ¶ 4(d).)

As the foregoing discussion makes clear, issues of material fact remain as to both of Defendant's challenges to Plaintiff's breach-of-contract claim. First, the Court already has held that the record is sufficient to permit a trier of fact to conclude that Plaintiff was constructively discharged. This claim of constructive discharge, if accepted, would support a recovery under Michigan law for wrongful termination without just cause. See Anchor Packing Co. v. Pro-Seal, Inc., 688 F. Supp. 1215, 1223-24 (E.D. Mich. 1988). Next, while Defendant asserts that it had just cause to terminate Plaintiff's employment contract in light of her purported breach of her duty to properly perform her managerial and administrative obligations, the Court has found that issues of fact remain as to whether Defendant's actions and decisions leading up to Plaintiff's resignation truly were grounded in such legitimate business concerns, or instead were motivated by a desire to force Plaintiff to quit without having to identify just cause for her termination. Thus,

39

Defendant is not entitled to summary judgment in its favor on Plaintiff's breach-of-contract claim.

## IV. __CONCLUSION__

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's November 22, 2005 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.

s/Gerald E. Rosen                        
Gerald E. Rosen
United States District Judge

Dated:  August 10, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 10, 2006, by electronic and/or ordinary mail.

s/V. Sims for LaShawn R. Saulsberry                        
Case Manager

40